## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

VALERIE ACKER,      :
       :
      Plaintiff    :    No. 3:15-cv-1319
       :
     vs.      :    (Judge Nealon)
       :
CAROLYN W. COLVIN, Acting  :
Commissioner of Social Security,  :
       :
      Defendant   :

FILED
SCRANTON

NOV 1 8 2016

Per_____
DEPUTY CLERK

## MEMORANDUM

On July 2, 2015, Plaintiff, Valerie Acker, filed this instant appeal[1] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration ("SSA") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 1461, et seq. (Doc. 1). The parties have fully briefed the appeal. For the reasons set forth below, the decision of the Commissioner denying Plaintiff's application for DIB will be affirmed.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

## BACKGROUND

Plaintiff protectively filed[2] her application for DIB on June 8, 2012, alleging disability beginning on April 13, 2012, due to a combination of narcolepsy, bursitis, fibromyalgia, essential tremors, depression, restless leg syndrome, absent seizures, anemia, low blood pressure, and dyslexia. (Tr. 11, 154).[3] The claim was initially denied by the Bureau of Disability Determination ("BDD")[4] on January 4, 2013. (Tr. 11). On March 21, 2013, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 11). An oral hearing was held on December 20, 2013, before administrative law judge Patrick Cutter, ("ALJ"), at which Plaintiff and an impartial vocational expert, Andrew Caporale, ("VE"), testified. (Tr. 11). On January 13, 2014, the ALJ issued a decision denying Plaintiff's claims because, as will be explained in more detail infra, Plaintiff was capable of performing light work with limitations. (Tr. 11-22).

---

2. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

3. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on September 14, 2015. (Doc. 11).

4. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

On May 2, 2014, Plaintiff filed a request for review with the Appeals Council. (Tr. 6). On May 4, 2015, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-3). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on July 2, 2015. (Doc. 1). On September 14, 2015, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 10 and 11). Plaintiff filed a brief in support of her complaint on October 27, 2015. (Doc. 12). Defendant filed a brief in opposition on November 30, 2015. (Doc. 13). Plaintiff filed a reply brief on December 8, 2015. (Doc. 14).

Plaintiff was born in the United States on February 14, 1974, and at all times relevant to this matter was considered a "younger individual"[5] whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. § 404.1563(c); (Tr. 151). Plaintiff graduated from high school, and can communicate in English. (Tr. 153, 155). Her employment records indicate that

---

5. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

she previously worked as a custodian for the government and a school. (Tr. 156). The records of the SSA reveal that Plaintiff had earnings in the years 1991 through 2012. (140). Her annual earnings range from a low of eight hundred seven dollars and seventy-five cents ($807.75) in 1992 to a high of twenty thousand sixty-two dollars and ten cents ($20,062.20) in 2001. (Tr. 140). Her total earnings during those twenty-one (21) years were two hundred sixty-seven thousand seven hundred eighty-eight dollars and ninety-eight cents ($267,788.98). (Tr. 140).

In a document entitled "Function Report - Adult" filed with the SSA on September 18, 2012, Plaintiff indicated that she lived in a trailer with family. (Tr. 175). From the time she woke up to the time she went to bed, Plaintiff would eat, sleep, watch television, take her son to school, sleep until he came home, and then "eat, sleep." (Tr. 176). She took care of her son, who was nine (9) years old at the time she completed the function report. (Tr. 176). She needed help sometimes with getting dressed, and performed all other personal care tasks slowly. (Tr. 176). She did not cook, perform household chores, or engage in yard work, but did do laundry; however, she had to have someone else for the laundry. (Tr. 177). She was able to drive a car, but it scared her because she was "always tired." (Tr. 178). She shopped for groceries once a week in a store for one (1) hour. (Tr. 178). She was able to walk a block and a half before needing to rest for ten (10)

4

minutes. (Tr. 180). When asked to check items which her "illnesses, injuries, or conditions affect," Plaintiff did not check squatting, bending, standing, reaching, kneeling, talking, hearing, stair climbing, seeing, or using hands. (Tr. 180).

Regarding her concentration and memory, Plaintiff needed special reminders to take care of her personal needs, take her medicine, and attend appointments. (Tr. 177, 179). She could count change, handle a savings account and use a checkbook, but could not pay bills because she did not have money. (Tr. 178). She could pay attention for "two minutes," she did not follow written or spoken instructions well, and she was not able to finish what she started. (Tr. 180). She did not handle stress or changes in routine well. (Tr. 181).

Socially, Plaintiff tried to get outside daily for fresh air, and stated that she did not go out often because she was depressed and did not "feel like doing anything." (Tr. 178). Her hobbies included watching television daily. (Tr. 179). She did not spend time with others. (Tr. 179). She did not have problems getting along with family, friends, neighbors, or others. (Tr. 181).

Plaintiff also filled out a Supplemental Function Questionnaires for pain and seizures. (Tr. 183-186). Plaintiff stated that she had pain that was deep and aching everywhere, had worsened since it began, was aggravated even just by lying in bed, was constant, and was relieved somewhat by Percocet. (Tr. 183-

184). Regarding her seizures, Plaintiff stated that her last seizure occurred on the day she completed the seizure questionnaire, that she experienced an unknown amount of seizures per week and month, that her seizures occurred without an aura and while she was both asleep and awake, that she lost consciousness when she experienced a seizure, that she was taking Topamax for her seizures, and that her husband said she "spaced out" during her seizures. (Tr. 185-186).

At her hearing on December 20, 2013, Plaintiff testified that she was disabled due to psychiatric conditions, seizures, fibromyalgia, irritable bowel syndrome ("IBS"), and narcolepsy. (Tr. 32-35). She stated that her pain from fibromyalgia was constant, interfered with her sleep, was somewhat relieved by pain medication, and was aggravated by cold weather. (Tr. 35). Regarding her seizures, she stated they occurred every day lasting anywhere from a couple of seconds to a couple of minutes. (Tr. 35). She was taking medication for her seizures that she stated was not working "as good as it should." (Tr. 35). She stated that she also suffered from IBS that made her unable to leave the house because she was unable to stop going to the bathroom. (Tr. 39). She described her narcolepsy as causing her to be tired all the time and fall asleep during the day. (Tr. 36). She was prescribed Adderall for this condition, which would help on some days, but not on others, according to Plaintiff. (Tr. 36). Regarding her

6

psychiatric problems, Plaintiff stated that she was depressed all the time, had a lot of anxiety, and experienced auditory and visual hallucinations several times a week, and that her medications for these problems did not seem to help. (Tr. 37, 42). She attended two (2) sessions with a therapist for her mental health problems. (Tr. 38).

Plaintiff testified that she had difficulty with concentration and memory. (Tr. 43). She stated that she had difficulty finishing tasks that she started, and that she could pay attention for maybe five (5) to ten (10) minutes. (Tr. 43). She would sleep all day while her son was at school, and would wake up not feeling rested. (Tr. 46).

## MEDICAL RECORDS

On April 20, 2012, Plaintiff had an appointment with Robert Ettlinger, M.D., due to complaints of pain. (Tr. 226). Her chronic problems included allergic rhinitis, depression, narcolepsy, and Restless Leg Syndrome. (Tr. 226). Plaintiff's self-reported symptoms included stress, back pain, bone/ joint symptoms, and myalgia in multiple areas. (Tr. 227). Her physical examination revealed she had an appropriate mood and affect and musculoskeletal aches. (Tr. 228). Plaintiff was diagnosed with Fibromyalgia. (Tr. 228). Plaintiff was scheduled for a follow-up visit with Dr. Ettlinger. (Tr. 228).

7

On November 14, 2012, Plaintiff underwent a consultative examination performed by Dawn Crosson, Psy.D. (Tr. 286). The history of Plaintiff's illness states that Plaintiff had been depressed since her teen years, that she felt hopeless and had suicidal ideations that she did not carry out, that she lacked motivation and energy, that she slept excessively and was constantly tired, and that she had bouts of mania that lasted a few hour to two (2) days that included excessive cleaning and hyperactivity. (Tr. 286). At the time of her evaluation, Plaintiff reported that she: continued to struggle with depression; cried excessively; had a mood that steadily declined after being terminated from her job; was restless and had racing thoughts; had suicidal ideations that she said she would not carry out; had auditory and visual hallucinations; had bouts of mania that lasted up to two (2) days during which she had a decreased need for sleep, had a lack of appetite, had feelings of euphoria, and would clean excessively; obsessed over details; had rigid thinking; was unable to cope with change; was less social and homebound; and was antsy and nervous around others. (Tr. 286-287). Her medications at this appointment included Adderall, Allegra, Calcium, Florinef, Flutcasone, Mirapex, Percocet, Propranol, Prozac, Topamax, and Voltaren. (Tr. 287). Her mental status examination revealed: good eye contact; a somewhat restricted mood and affect; an emotionless presentation aside from tearfulness when discussing a recent job

termination; feelings of guilt due to unemployment; slow but deliberate speech; tangential and wordy thoughts; struggle with social cues; adequate abstract thinking; reasonable insight; a recognition of the need for therapy and a medication regime; and a compromised memory. (Tr. 287-288). Her Axis I Diagnoses included Bipolar II Disorder and Generalized Anxiety Disorder. (Tr. 288). Dr. Crosson opined that: Plaintiff's prognosis was hopeful and her symptoms were apt to improve with ongoing psychotherapy and a concurrent medication regime; that with regards to Plaintiff's ability to perform activities of daily living, Plaintiff's mood fluctuated and her medical problems coupled with her depression often rendered her in bed for several days without eating or taking care of hygiene; that, socially, Plaintiff was isolated and withdrawn, had difficulty communicating with her husband, and did not appear to understand his needs; that Plaintiff had no difficulties in the area of impulse control; that with regards to concentration, persistence, and pace, Plaintiff had racing thoughts and auditory hallucinations, and struggled with concentration during the interview; and, lastly, that Plaintiff would likely be able to sustain attention, concentration, or pace to satisfactorily perform work for eight (8) hours a day and forty (40) hours per week. (Tr. 289).

On November 26, 2012, Plaintiff had an appointment with Dr. Ettlinger due

to complaints of depression and pain. (Tr. 362). Plaintiff's self-reported symptoms included depression, difficulty concentrating, psychiatric symptoms, and back and joint pain, both of which were made worse with cold weather and excess activity. (Tr. 363). Her physical exam revealed she had normal range of motion, muscle strength, and stability in all extremities with no pain on inspection; normal insight; and an appropriate mood and affect. (Tr. 364-365). Plaintiff was assessed as having Fibromyalgia and Depression. (Tr. 365). Plaintiff was instructed to follow-up with Dr. Ettlinger. (Tr. 365).

On December 2, 2012, Dr. Crosson completed a Mental Residual Functional Capacity form. (Tr. 284-285). She opined that Plaintiff had slight restrictions in her ability to: understand, remember and carry out detailed instructions; make judgments on simple work-related decisions; interact appropriately with the public, supervisors, and co-workers; respond appropriately to work pressure in a usual work setting; and respond appropriately to changes in a routine work setting. (Tr. 284-285). Plaintiff had no restrictions in the remaining areas of the form. (Tr. 284-285). In support of this assessment, Dr. Crosson stated that Plaintiff had anxiety and rigid thinking with bouts of mania. (Tr. 285).

On December 4, 2012, Karen Weitzner, Ph.D., a non-examining, non-treating physician, completed a Mental Residual Functional Capacity form based

on Plaintiff's medical records up to that date. (Tr. 72-74). Dr. Weitzner opined
that Plaintiff was: moderately limited in her ability to understand, remember, and
carry out detailed instructions with the explanation that she had difficulty
sustaining concentration that impacted her ability to retain instructions past three
(3) step tasks; moderately limited in her ability to maintain attention and
concentration for extended periods; moderately limited in her ability to interact
appropriately with the general public; moderately limited in her ability to maintain
socially appropriate behavior and to adhere to basic standards of neatness and
cleanliness; and moderately limited in her ability to respond appropriately to
changes in the work setting. (Tr. 72-73). Dr. Weitzner also performed a
Psychiatric Review Technique. (Tr. 65-72). Based on a review of Plaintiff's
medical records, Dr. Weitzner opined that Plaintiff had an affective disorder under
Listing 12.04 and an anxiety disorder under Listing 12.06, but that Plaintiff had
only moderate difficulties in the areas of maintaining social functioning and in
maintaining concentration, persistence, or pace, mild difficulties with activities of
daily living, and no repeated episodes of decompensation. (Tr. 69). Dr. Weitzner
concluded that Plaintiff, therefore, did not meet the "B" criteria for these Listings,
and also concluded that evidence did not establish the presence of "C" criteria for
the same. (Tr. 69).

On December 28, 2012, Naomi Scearce, M.D., performed a consultative examination of Plaintiff for reported fibromyalgia, depression, bursitis, excess daytime somnolence, and petit mal seizures. (Tr. 296). Plaintiff stated that she had: pain that lead to a fibromyalgia diagnosis; a herniated disc in her neck that caused a limitation in movement of her head rotation, pain in her neck, and numbness in her arms; staring spells; Restless Leg Syndrome; absence seizures; and narcolepsy. (Tr. 296). Plaintiff reported that she could not get out of bed some days, felt like she was sometimes paralyzed, avoided driving because she felt her issues interfered with concentration, and often felt so unwell that she could not play with her son. (Tr. 296). Her physical examination revealed that she was: healthy, well-developed, alert, cooperative, and oriented; had limited eye contact; had overall appropriate behavior; was a poor historian; had a normal gait and spinal contour; had normal lower extremities with no instability, full range of motion, and with 5/5 strength bilaterally; had 5/5 strength bilaterally in her upper extremities with normal muscle tone and bulk bilaterally; had a normal mood and affect, a grossly intact memory, and attention span; had articulate and fluent speech; had sensation intact to light touch; had brisk and symmetrical Achilles and patellar "DTR's;" had clear and appropriate thought processes; had intact memory; had grossly intact insight and judgment; and had grossly intact cranial nerves. (Tr.

12

297-298).  With regards to epilepsy, it was noted that Plaintiff appeared to have "fair to good control of her seizures." (Tr. 298).  With regards to her dyslexia, she was a poor reader and would have trouble reading and following directions beyond a third grade level. (Tr. 298).  With regard to myalgia, Plaintiff's exam was benign. (Tr. 298).  With regards to narcolepsy, Dr. Scearce noted that she did not think Plaintiff was found to have true narcolepsy, but that she had severe daytime somnolence with shortened interval to sleep, and that, during the exam, she did not have trouble with excessive sleepiness. (Tr. 298).  With regards to depression, Dr. Scearce opined that it appeared to have significant effects on her daily function, but that she deferred to a psychiatric evaluation on this impairment. (Tr. 298).  Dr. Scearce also completed a Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities. (Tr. 293-295).  Dr. Scearce opined that Plaintiff could: frequently lift and/ or carry twenty (20) pounds; occasionally lift and/ or carry fifty (50) pounds; stand and walk for four (4) hours; sit for six (6) hours with alternating sitting and standing at her option; engage in unlimited pushing and pulling within the aforementioned weight restrictions; occasionally bend, kneel, stoop, and crouch; and never balance or climb. (Tr. 293-294).  Dr. Scearce also opined that Plaintiff had limitations with reaching, handling, fingering and feeling due to "disc in neck [that caused] intermittent

numbness in hands, pain in neck/ shoulders" and should avoid heights, moving machinery, extreme cold temperatures, fumes, odors, and gases. (Tr. 295).

On January 28, 2013, Plaintiff had an appointment with Dr. Ettlinger due to complaints of depression and allergies. (Tr. 367). Her physical examination revealed her lumbar spine was tender and had mild pain with motion. (Tr. 369). She was assessed as having low back pain. (Tr. 369).

On April 16, 2013, Plaintiff had an appointment with Dr. Ettlinger for complaints of depression, anxiety, and neck pain. (Tr. 371). Her physical examination was normal, including an appropriate mood and affect. (Tr. 375). Her diagnoses included Bipolar I Disorder. (Tr. 375).

On June 21, 2013, Plaintiff had an appointment with Dr. Ettlinger for depression. (Tr. 376). Her symptoms included a decreased need for sleep, difficulty concentrating, difficulty falling and staying asleep, being easily startled, fatigue, poor judgment, racing thoughts, restlessness, a depressed mood, excessive worry, paranoia, thoughts of death or suicide, back pain, neck stiffness, and myalgia. (Tr. 377-378). Her physical examination revealed a tender spine and an appropriate mood and affect. (Tr. 380). She was assessed as having Bipolar I Disorder, low back pain, and Restless Leg Syndrome. (Tr. 381).

On September 26, 2013, Plaintiff had an appointment with Dr. Ettlinger for

14

a medication check-up and to have a form completed. (Tr. 382). Plaintiff's self-reported symptoms included fatigue, abdominal pain, anxiety, insomnia, and back pain. (Tr. 384). Her physical examination revealed that she was well-developed and had tenderness and moderate pain with motion in her lumbar spine, tenderness in her left rib, and an appropriate mood and affect. (Tr. 386). Plaintiff was assessed as having a back sprain, Bipolar I Disorder, low back pain, and Restless Leg Syndrome. (Tr. 386). Plaintiff was instructed to keep taking her medications, which included Klonopin, Percocet, Voltaren, Topamax, Florinef Acetate, Diclofenac, Cymbalta, Fluticason, Allegra, Propranolol, and Methylphenidate. (Tr. 386-387).

On August 29, 2013, Plaintiff had an appointment with Maria Michalek, M.D., for a history of seizures, hypersomnia, essential tremor, and Restless Leg Syndrome. (Tr. 343). It was noted that Plaintiff was taking Topamax which stopped her seizures, Adderall that did not entirely ameliorate her excessive daytime sleepiness, Inderal for her essential tremor, Mirapex for Restless Leg Syndrome, and Cymbalta for fibromyalgia. (Tr. 343). Plaintiff noted she continued to experience anxiety, for which she was prescribed Klonopin. (Tr. 343).

On October 15, 2013, Lauren D. Conley, B.S., of Stauffer Psychological

15

Services, wrote a letter to Plaintiff's attorney concerning Plaintiff's psychological treatment and therapy. (Tr. 389). The letter noted that Plaintiff began treatment with Stauffer Psychological Services on February 26, 2013, at which time Plaintiff presented with symptoms of depression, anxiety, distress, nightmares, and lack of energy and motivation to do daily tasks. (Tr. 389). Mrs. Conley stated that Plaintiff suffered from low self-esteem, had problems reading and writing, and was in need of continued therapy to gain appropriate coping mechanisms to handle her symptoms of depression. (Tr. 389).

From September 30, 2013, to November 14, 2013, Plaintiff had appointments at National Human Services ("NHS"). (Tr. 390-403). At these appointments at the NHS, Plaintiff denied having suicidal or homicidal ideations, was noted as pleasant and talkative, and made progress with treatment. (Tr. 391, 395-396). At her appointment on November 14, 2013, it was noted that Plaintiff reported she was depressed, did not want to get out of bed, received "pressure from friends and neighbors," and had "trouble throwing things away." (Tr. 398). Her mental status examination revealed that she had a goal-divided thought process, delayed onset speech, a constricted affect, a decreased mood, restricted insight, and poor judgment. (Tr. 402). An NHS medical doctor, whose name is illegible, gave Plaintiff an Axis I diagnosis of Post Traumatic Stress Disorder and

Major Depressive Disorder, wanted to rule out Bipolar Disorder, and

recommended that Plaintiff continue taking her current medications.  (Tr. 403).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of

all legal issues decided by the Commissioner.  See Poulos v. Commissioner of

Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of

Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55

F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's

findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those

findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d

1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

Factual findings which are supported by substantial evidence must be upheld.  42

U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where

the ALJ's findings of fact are supported by substantial evidence, we are bound by

those findings, even if we would have decided the factual inquiry differently.");

Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the

Secretary must be accepted as conclusive by a reviewing court if supported by

substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe

v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520,

17

1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence. <u>Mason</u>, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-07. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the Commissioner must determine the claimant's residual functional capacity. Id. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a

discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945;

Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that

which an individual is still able to do despite the limitations caused by his or her

impairment(s).").

"At step five, the burden of proof shifts to the Social Security

Administration to show that the claimant is capable of performing other jobs

existing in significant numbers in the national economy, considering the

claimant's age, education, work experience, and residual functional capacity. "

Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir.

2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status

requirements of the Social Security Act through the date last insured of December

31, 2016. (Tr. 13). At step one, the ALJ found that Plaintiff had not engaged in

substantial gainful work activity from her alleged onset date of April 13, 2012.

(Tr. 13).

At step two, the ALJ determined that Plaintiff suffered from the severe[6]

---

6. An impairment is "severe" if it significantly limits an individual's ability to
perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the
abilities and aptitudes necessary to do most jobs, such as walking, standing,

combination of impairments of the following: "narcolepsy, fibromyalgia, seizure disorder, depression, and anxiety (404.1520(c))." (Tr. 13-14).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (Tr. 14-16).

At step four, the ALJ determined that Plaintiff had the RFC to perform light work with limitations. (Tr. 16-21). Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except sit for six hours and stand and walk up to four hours per workday and requires an option to sit or stand at will. [Plaintiff] is capable of occasional stooping, kneeling, crouching, crawling, and bending and cannot balance or climb. She must avoid work at unprotected heights or around dangerous moving machinery. There is a need to avoid temperature extremes and concentrated exposure to dust, fumes, gases, and dampness. She can frequently use the arms or hands. The work should be unskilled (with unskilled defined as work that requires little or

---

sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

no judgment to do simple duties that can [be] learned on the job
in thirty days or less with little vocational preparation).
[Plaintiff] should perform only routine repetitive one-to two-
step tasks.  The work should involve occasional decision
making, occasional changes, no fast-paced production, no
quotas, and occasional interaction with the public, coworkers,
and supervisors. [Plaintiff] would be expected to miss one day
per month and would be expected to be off task for ten percent
of the workday in addition to regular breaks.

(Tr. 16).

At step five of the sequential evaluation process, because Plaintiff could not

perform any past relevant work, and considering the her age, education, work

experience, and RFC, the ALJ determined "there are jobs that exist in significant

numbers in the national economy that the [Plaintiff] can perform (20 C.F.R.

404.1569 and 404.1569(a))."  (Tr. 21-22).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined

in the Social Security Act at any time between April 13, 2012, the alleged onset

date, and the date of the ALJ's decision.  (Tr. 22).

## DISCUSSION

On appeal, Plaintiff asserts the following arguments: (1) substantial

evidence does not support the ALJ's Step Two evaluation; (2) substantial evidence

does not support the ALJ's RFC determination; (3) the ALJ's interpretation of the

objective medical evidence is not supported by substantial evidence; (4)

23

substantial evidence does not support the ALJ's credibility finding; and (5) the

ALJ erred in failing to obtain further explanation from the VE regarding the

sit/stand at will option in relation to the Dictionary of Occupational Titles

("DOT"). (Doc. 12, pp. 1-2, 8-17). Defendant disputes these contentions. (Doc.

13, pp. 11-27).

### 1.    Step Two Evaluation

Plaintiff argues that the ALJ erred in not finding Plaintiff's Restless Leg

Syndrome and Irritable Bowel Syndrome to be a severe impairments at Step Two

in violation of Social Security Regulation ("SSR") 96-3p because these

impairments were more than a slight abnormality that had more than a minimal

effect on her ability to do basic work activities. (Doc. 12, pp.8-9).

Step Two "'is a threshold analysis that requires [a claimant] to show that he

has one severe impairment.'" Traver v. Colvin, 2016 U.S. Dist. LEXIS 136708, at

*29 (M.D. Pa. Oct. 3, 2016) (Conaboy, J.) (citing Bradley v. Barnhart, 175

F.App'x 87 (7 th Circuit 2006)).  SSR 96-3p states that an impairment is

considered severe if it "significantly limits an individual's physical or mental

abilities to do basic work activities." SSR 96-3p.  An impairment is not severe if it

is a slight abnormality that has no more than a minimal effect on the Plaintiff's

ability to do basic work activities. Id. The United States Court of Appeals for the

Third Circuit has held that as long as the ALJ finds at least one (1) impairment to be severe at Step Two, that step is resolved in Plaintiff's favor, the sequential evaluation process continues, and any impairment that is found to non-severe is harmless error because the ALJ still has to consider all impairments, both severe and non-severe, in the RFC analysis. See 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); see also Salles v. Commissioner of Social Security, 229 F. App'x 140, 145 n.2 (3d Cir. 2007) ("Because the ALJ found in [the plaintiff's] favor at Step Two, even if he had erroneously concluded that some of her other impairments were non-severe, any error was harmless." (citing Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005))); Popp v. Astrue, 2009 U.S. Dist. LEXIS, *4 (W.D. Pa. April 7, 2009) ("The Step Two determination as to whether Plaintiff is suffering from a severe impairment is a threshold analysis requiring the showing of only one severe impairment . . . In other words, as long as a claim is not denied at Step Two, it is not generally necessary for the ALJ to have specifically found any additional alleged impairment to be severe.") (citations omitted).

In the case at hand, the ALJ found several of Plaintiff's impairments to be severe at Step Two, and, thus, resolved this step in Plaintiff's favor and continued the sequential evaluation process. (Tr. 13-15). The ALJ completed all five (5)

steps of the sequential evaluation process. (Tr. 16-22). Therefore, it was harmless error that the ALJ did not find Plaintiff's Restless Leg Syndrome and Irritable Bowel Syndrome to be severe impairments. As such, because the sequential evaluation process continued past Step Two, substantial evidence supports the ALJ's decision at Step Two, and the decision will not be disturbed on appeal based on this assertion.

### 2. RFC Determination

#### a. Attention and Concentration

Plaintiff asserts that substantial evidence does not support the ALJ's determination that her attention and concentration will be reduced to only ninety percent (90%) of the workday because "it flows from the ALJ's faulty credibility analysis concerning [Plaintiff's] pain and psychiatric limitations." (Doc. 12, p. 10). However, Plaintiff's argument is without merit because the following objective medical evidence discussed by the ALJ in his opinion supports the ALJ's ten percent (10%) reduction in attention and concentration: (1) Dr. Crossen opined that Plaintiff's difficulty in maintaining concentration resulted in no restriction of her ability to understand, remember, and carry out short, simple instructions and in only a slight restriction in her ability to understand, remember, and carry out detailed instructions and to make judgments regarding simple, work-related

26

decisions; and (2) Dr. Weitzner opined that Plaintiff was able to retain information and complete simple tasks up to three (3) steps.  (Tr. 284, 298).  As such, substantial evidence supports the ALJ's reduction in attention and concentration to ninety percent (90%), and this determination will not be disturbed on appeal based on this assertion.

### b.    Light Work Determination

Plaintiff asserts that the ALJ erred in determining Plaintiff could perform light work because the ALJ's RFC determination that she could stand and/ or walk for four (4) hours in an eight-hour workday did not align with the regulatory definition of light work.  (Doc. 12, p. 11).

According to 20 C.F.R. § 404.1567(b), light work:

> involves lifting no more than 20 pounds at a time with frequent
> lifting or carrying of objects weighing up to 10 pounds.  Even
> though the weight lifted may be very little, a job is in this
> category when it requires a good deal of walking or standing,
> or when it involves sitting most of the time with some pushing
> and pulling or arm or leg controls.  To be considered capable of
> performing a full or wide range of light work, you must have
> the ability to do substantially all of these activities.

See 20 C.F.R. § 404.1567(b), Light Work.  "Light work generally requires 'a good deal of walking or standing' . . . 'for a total of approximately 6 hours of an 8-hour workday.'"  Michaels v. Colvin, 621 Fed. Appx. 35, 12 (2d Cir. 2015) (citing SSR

83-10, 1983 SSR LEXIS 30, at *13). However, SSR 83-10 has been interpreted to mean that this six (6) hour benchmark for standing and/or walking applies to a full range of light work. Lackey v. Colvin, 2013 U.S. Dist. LEXIS 64647, at *8-9 (W.D. Pa. May 7, 2013) ("Plaintiff misinterprets SSR 83-10, 1983 LEXIS 30 as precluding any light work for an individual who cannot stand or walk for 6 hours of an 8-hour work day when in fact that ruling only provides that 'the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours out of an 8-hour work day.' Thus, while it is true that plaintiff is not able to perform the full range of light work, the ALJ did not so find. Instead, based on the medical evidence, the ALJ determined that plaintiff can stand and/ or walk up to 4 hours of an 8-hour day, and then relied upon testimony from a vocational expert indicating that there are jobs at the light exertional level which an individual who is limited to standing and/or walking 4 hours in an 8-hour workday nevertheless can perform. Accordingly, the court is satisfied that the ALJ's residual functional capacity finding that plaintiff can perform less than the full range of light work is consistent with SSR 83-10, 1983 LEXIS 30 and the regulations and otherwise is supported by the record."). Thus, the six (6) hour benchmark for light work is applicable only in cases in which an ALJ determines that a claimant can perform a full range of light work.

In the case at hand, the ALJ made it clear, in both the questions posed to the VE in the hypothetical and in the resulting RFC determination, that the light work Plaintiff could perform was not a full range, but rather was restricted and/ or limited given the aforementioned restrictions accompanying the RFC determination, including the restriction that Plaintiff was limited to standing and/ or walking for four (4) hours in an eight-hour workday. (Tr. 16, 56-57, 59). The VE responded to this hypothetical that there were jobs available in the economy in response to the hypothetical that the RFC encompasses. (Tr. 59). As such, because the ALJ did not determine that Plaintiff could perform a full range of light work, but rather could perform a more restrictive form of light work with the aforementioned restrictions, including standing and/ or walking only four (4) hours in an eight-hour workday, and because the ALJ relied on the VE's response to a properly posed hypothetical based on the RFC described, the ALJ's RFC determination is supported by substantial evidence and will not be disturbed on appeal based on this assertion.

### 3.   **Medical Evidence Evaluation**

Plaintiff asserts that the ALJ failed to consider SSR 12-2p when evaluating her fibromyalgia and SSR 99-2p when evaluating her narcolepsy. (Doc. 12, pp.

29

11-12).[7] Plaintiff's assertion seems to insinuate that the ALJ did not find consider these impairments and the accompanying symptoms. It is clear that these "medical evidence" assertions are without merit because the ALJ found both fibromyalgia and narcolepsy to be severe impairments, and then considered the impact of these impairments on Plaintiff's RFC. (Tr. 13-22). As such, the ALJ's decision will not be disturbed on appeal based on this assertion.

### 4.   Plaintiff's Credibility Assessment

Plaintiff argues that substantial evidence does not support the ALJ's determination that Plaintiff was not entirely credible because: (1) he failed to consider her subjective statements about her pain; (2) he did not consider the side-effects of her medications; and (3) relied, in error, on one GAF score of sixty-five (65) over several GAF scores of fifty (50) and did so even though the Fifth Edition of the Diagnostic and Statistic Manual of Mental Disorders no longer takes GAF

---

7. To the extent that Plaintiff is asserting that the ALJ failed to evaluate Plaintiff for Chronic Fatigue Syndrome, this impairment is separate from narcolepsy, and, moreover, Plaintiff never alleged this was an impairment that rendered her disabled. As such, the ALJ was under no obligation to discuss this impairment as it was never alleged by Plaintiff. "There is no requirement that an ALJ consider impairments that a claimant does not allege are disabling." Podsiad v. Astrue, 2010 U.S. Dist. LEXIS 31636, *63-64 (D. Del. Feb. 22, 2010) (holding that plaintiff's obesity was not a reason to remand the case because plaintiff did not allege obesity in his application or at his hearing) (citing Rutherford v Barnhart, 399 F.3d 546, 552-53 (3d Cir. 2005)).

scores into consideration. (Doc. 12, pp. 13-15).

As part of Step Four of the sequential evaluation process, once an ALJ concludes that there is a medical impairment that could reasonably cause the alleged symptoms, "he or she must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work." Hartranft, 181 F.3d at 362 (citing 20 C.F.R. § 404.1529(c)). This "requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." Id. In evaluating the intensity and persistence of a claimant's symptoms, an ALJ should consider: (1) the claimant's history; (2) medical signs and laboratory findings; (3) medical opinions; and (4) statements from the claimant, treating and non-treating sources, and other persons about how the claimant's symptoms affect him/her. See 20 C.F.R. § 404.1529. Importantly, "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." 1996 SSR LEXIS 4 (1996); 20 C.F.R. § 404.1529(c)(2).

"Generally, 'an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged

31

with the duty of observing a witness's demeanor and credibility.'" <u>Fell v. Astrue</u>,

2013 U.S. Dist. LEXIS 167100, *29 (M.D. Pa. 2013) (Conaboy, J.) (quoting

<u>Walters v. Commissioner of Social Sec.</u>, 127 F.3d 525, 531 (6th Cir. 1997));

<u>Frazier v. Apfel</u>, 2000 U.S. Dist. LEXIS 3105 (E.D. Pa. Mar. 6, 2000). "'The

credibility determinations of an administrative judge are virtually unreviewable on

appeal." <u>Hoyman v. Colvin</u>, 606 Fed. App'x 678, 681 (3d Cir. 2015) (citing

<u>Beiber v. Dep't of the Army</u>, 287 F.3d 1358, 1364 (Fed. Cir. 2002)).

Social Security Ruling 96-7p gives the following instructions in evaluating

the credibility of the claimant's statements:

> In general, the extent to which an individual's statements about
> symptoms can be relied upon as probative evidence in
> determining whether the individual is disabled depends on the
> credibility of the statements.  In basic terms, the credibility of
> an individual's statements about pain or other symptoms and
> their functional effects is the degree to which the statements
> can be believed and accepted as true.  When evaluating the
> credibility of an individual's statements, the adjudicator must
> consider the entire case record and give specific reasons for the
> weight given to the individual's statements.

SSR 96-7p. "In particular, an ALJ should consider the following factors: (1) the

plaintiff's daily activities; (2) the duration, frequency and intensity of the

plaintiff's symptoms; (3) precipitating and aggravating factors; (4) the type,

dosage, effectiveness, and side effects of any medication taken to alleviate the

32

symptoms; (5) treatment, other than medication for relief of the symptoms; (6) any

measures the plaintiff uses or has used to relieve the symptoms; (7) the plaintiff's

prior work record; and (8) the plaintiff's demeanor during the hearing." Jury v.

Colvin, 2014 U.S. Dist. LEXIS 33067, *33 (M.D. Pa. 2014) (Conner, J.) (citing 20

C.F.R. § 404.1529(c)(3)).

> In assessing Plaintiff's credibility in this case, the ALJ stated:

> After careful consideration of the evidence, the undersigned
> finds that [Plaintiff's] medically determinable impairments
> could reasonably be expected to cause the alleged symptoms;
> however, [Plaintiff's] statements concerning the intensity,
> persistence and limiting effects of these symptoms are not
> entirely credible for the reasons explained in this decision.

(Tr. 17). The ALJ discussed the medical record highlights in support of his

credibility determination, including, but not limited to, the following: (1)

Plaintiff's physical examinations revealed generally mild and benign findings,

with normal gait, no focal motor deficits, no focal sensory deficits, no cerebellar

deficits, and normal range of motion, muscle strength and stability in all

extremities without pain on inspection during some examinations; (2) Plaintiff

reported at her oral hearing that she was experiencing no seizures and that she

tolerated Topamax; (3) there was a lack of specialized treatment for her Irritable

Bowel Syndrome; (4) Plaintiff reported that her psychological symptoms were

generally mild and improved with medication and failed to attend all of her therapy appointments; (5) Plaintiff's mental status examination revealed Plaintiff was neatly and adequately dressed, maintained good eye contact, was cooperative, and had adequate judgment; and (6) the GAF score of fifty (50) assigned to Plaintiff was not supported by the mental status examination findings, but rather was effectuated by Plaintiff's self-reported symptoms and difficulties. (Tr. 17-20). In terms of Plaintiff's activities of daily living, the ALJ noted that Plaintiff testified that she was able to take care of her personal hygiene, drive a vehicle, shop in stores, care for her child, read, and watch television. (Tr. 19). Thus, the ALJ considered the aforementioned Jury factors in his analysis, including daily activities, treatment and measures used to relieve symptoms, and the duration, frequency and intensity of Plaintiff's symptoms, which is evident in the resulting restrictive RFC finding.

Upon review of the record and the ALJ's credibility determination, it is determined that there is substantial evidence to support the ALJ's credibility finding of Plaintiff. The ALJ is correct that there were enough inconsistencies in the record regarding Plaintiff's self-reported limitations that weakened her credibility, including the benign examination findings, lack of evidence for medication side-effects, and Plaintiff's self-reported activities of daily living.

Furthermore, the ALJ did not find Plaintiff to be not credible, but only not entirely credible. (Tr. 17). The restrictive RFC finding is evidence that ALJ found Plaintiff credible to some degree, albeit not completely, as the ALJ concluded Plaintiff could perform only a limited range of light work based, in part, on her subjective complaints. (Tr. 16-20). As such, because the ALJ's credibility determination is to be accorded great deference and is supported by substantial evidence, the ALJ's decision will not be disturbed on appeal based on Plaintiff's assertion.

### 5.   <u>Sit/ Stand Option</u>

Plaintiff asserts that the ALJ erred in concluding that Plaintiff could perform a "full range of light work" with a sit/stand at will option because: (1) it would seriously erode the occupational base for light work; and (2) the ALJ did not elicit further testimony from the VE regarding the VE's conclusion that Plaintiff could perform light work with a sit/ stand option despite the DOT's silence on this option. (Doc. 12, pp. 16-17).

First and foremost, it is clear that the ALJ did not indicate that Plaintiff could perform a <u>full range</u> of light work because: (1) the hypothetical posed to the VE specifically stated, "[i]f you would , please, assumed a hypothetical person, who . . . has a residual functional capacity to perform a range of light work . . .

subject to the following limitations;" and (2) determined Plaintiff had the RFC to perform light work with limitations.  (Tr. 16, 56).

Next, regarding Plaintiff's argument that there was no acknowledgment that a sit/ stand at will option would erode Plaintiff's occupational base for light work, that argument, too, is without merit.  The VE specifically stated, in response to the hypotheticals, the following: "But I do want to note for the record the sit, stand requirement, of course, that is the only erosion.  That's the big erosion for the light exertional level." (Tr. 58).

This Court now turns to Plaintiff's argument that the ALJ erred in not obtaining further testimony from the VE regarding the sit/stand at will option and the DOT's silence on this issue.  The administrative law judge has a duty to develop the record and flesh out any inconsistencies.  Social Security Regulation 00-4p states:

> Occupational evidence provided by a [VE] generally should be consistent with the occupational information supplied by the DOT.  When there is an apparent unresolved conflict between [VE] evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the [VE] evidence to support a determination or decision about whether the claimant is disabled.  At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

SSR 00-4p, *2; SSR LEXIS 8, *4.

The conflict allegedly arises because the DOT is silent on the sit/stand option presented by the ALJ to the VE in his hypothetical, and included in the RFC. Plaintiff contends that the ALJ should have elicited a reasonable explanation from the VE regarding the conflict. However, this Court does not agree with Plaintiff's assessment of this situation. In a case similar to the one at hand, Judge Conaboy of this Court stated:

> In general terms, the VE's observation that these positions allow change of position at will, is appropriately viewed as a vocational expert's application of her expertise, her "knowledge, experience, and observations" in the words of the ALJ. [] Her reduction in the number of positions based on the conflict is similarly appropriate.
>
> Viewed in this context, the ALJ does not run afoul of SSR 00-4p, 2000 SSR LEXIS 8 regarding [these] positions because he was not presented with an "apparent unresolved conflict." Rather, a fair reading of the colloquy here is that the ALJ was presented with a conflict (made apparent by the VE's testimony) and the VE resolved the conflict to the ALJ's satisfaction in the course of her testimony. In this context, the ALJ would be under no obligation to elicit further testimony from the VE on the sit/stand issue for the [positions] for which the VE testified a reduction in numbers would be appropriate based on this limitation. . . . Importantly, the ALJ acknowledges in his decision that the VE's testimony is inconsistent with the DOT. . .

Minichino v. Colvin, 955 F. Supp. 2d 366, 381 (M.D. Pa. 2013) (Conaboy, J.). In

the case at hand, in the hypotheticals presented to the VE, the ALJ included the

sit/stand limitation, as he stated:

> If you would, please, assumed a hypothetical person, who has
> the same vocational profile as [Plaintiff]. And has a residual
> functional capacity to perform a range of light work as defined
> in the regulations subject to the following limitations. The
> individual can stand, walk up to four-hours per day; sit up to
> six-hours per day; and requires an option to sit or stand at will.

(Tr. 57). The VE's response indicates that she implicitly acknowledged that the

relevant DOT sections were silent regarding a sit/stand option, as the VE

responded as follows to the hypothetical posed by the ALJ:

> But the sit stand option means you have to be able to be
> productive in either position. It is not contradictory or
> inconsistent with the DOT. It's not very well defined in the
> DOT. If you read closely, you can make [] that assumption.
> But I'd rather base the ability for an individual to sit or stand at
> will, all my observations and the observations of my colleagues
> in the actual work place. So the information I will give you is
> based on that, rather than the definition in the DOT. But the
> examples of work that do allow for a sit, stand option would be
> that of . . . an assembler, electrical accessories I [or a] non-
> government mail clerk.

(Tr. 58-59). Additionally, the ALJ was aware of and acknowledged the conflict

because he stated that the VE's testimony was consistent with the DOT with the

exception of the sit/stand option, but that there was a reasonable explanation for

this discrepancy. (Tr. 22).

In accordance with the rationale above and the facts of this case, the conflict was implicitly acknowledged by the VE in his response to the hypotheticals, and was acknowledged and understood by the ALJ in arriving at his RFC determination.  Therefore, it is determined that substantial evidence supports the ALJ's reliance on the VE's testimony because there was no "apparent unresolved conflict" between the VE's testimony and the DOT in violation of SSR 00-4p.

**CONCLUSION**

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is supported by substantial evidence.  Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be denied and the decision of the Commissioner will be affirmed.

A separate Order will be issued.

**Date**: November 18, 2016

/s/ **William J. Nealon**
**United States District Judge**

39